**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| QCX LLC d/b/a Polymarket US,<br>*Plaintiff*,<br>v.<br>CATHERINE L. HANAWAY, in her official capacity as Attorney General of the State of Missouri; JAN M. ZIMMERMAN, in her official capacity as Chairman of the Missouri Gaming Commission; KEVIN M. SPAULDING, in his official capacity as Commissioner of the Missouri Gaming Commission; KEVIN CANTWELL, in his official capacity as Commissioner of the Missouri Gaming Commission; SAM GLADNEY, in his official capacity as Commissioner of the Missouri Gaming Commission; and ROGER STOTTLEMYRE, in his official capacity as Commissioner of the Missouri Gaming Commission,<br>*Defendants*. | Case No.: 26-cv-1930 |

**COMPLAINT FOR DECLARATORY**
**<u>JUDGMENT AND INJUNCTIVE RELIEF</u>**

**INTRODUCTION**

1. This action seeks to prevent imminent and irreparable harm arising from Missouri's threatened enforcement of protectionist state gambling laws against federally regulated derivatives exchanges—enforcement Congress has expressly prohibited. Plaintiff QCX LLC, d/b/a Polymarket US, operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"). Missouri's threatened enforcement is preempted by the Commodity Exchange Act ("CEA") and violates the U.S. Constitution's Commerce Clause.

2. The CEA vests the CFTC with sole regulatory authority over derivatives traded on designated contract markets. Among the financial instruments subject to the CFTC's exclusive jurisdiction are event contracts, a type of derivative whose value depends on the outcome of real-world events. Polymarket US offers event contracts for trading on a CFTC-regulated exchange. Exercising its comprehensive, exclusive authority, the CFTC decides whether to prohibit certain event contracts as contrary to the "public interest." 7 U.S.C. § 7a-2(c)(5)(C). Despite this congressional grant of authority, the State has claimed for *itself* the power—backed by the threat of fines—to determine whether federally regulated trading is in the "public interest." Ex. 1 (Cease and Desist Letter) at 1.

3. Missouri is attempting to relitigate a debate Congress settled over 50 years ago. Back then, States also treated derivatives trading as "wagering . . . subject to state gambling laws." Ex. 1 at 2. That is one reason why, in 1974, Congress amended the CEA to grant the CFTC "exclusive jurisdiction" with respect to certain derivatives "traded or executed on a contract market designated" under the Act. 7 U.S.C. § 2(a)(1)(A). Recognizing what Defendants do not—that this language preempts state law—Missouri's Legislature later confirmed that state trading laws do not apply to a "contract market designated by the Commodity Futures Trading Commission." Mo. Rev. Stat. § 409.800(12); *see id.* § 409.806(1) (similar).

4. Since 1974, Congress has repeatedly expanded the CFTC's exclusive authority to cover new derivatives—including event contracts—traded on federally regulated contract markets. As the Third Circuit recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026). For the same reason, another court in this Circuit preliminarily enjoined Minnesota from enforcing against

Polymarket US state law that would likely regulate transactions over which the CFTC has "exclusive jurisdiction." *United States v. Minnesota*, 2026 WL 2150211, at *14–15 (D. Minn. July 27, 2026).

5. Missouri's threatened enforcement action against federally regulated prediction markets is part of a spate of state efforts to undermine the CFTC's exclusive jurisdiction. Currently engaged in a multi-state campaign to defend that jurisdiction, the CFTC has sought to enjoin regulators in other jurisdictions that are attempting to interfere with contract markets' operations. The CFTC has already obtained preliminary injunctions barring state enforcement against CFTC-regulated prediction markets in multiple jurisdictions. *See Coinbase Fin. Mkts. v. Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026); *Minnesota*, 2026 WL 2150211, at *18. And it has issued new regulations confirming that "event contracts" "traded on CFTC-registered national exchanges" fall comfortably within the agency's regulatory ambit. *Further Definition of "Swap" to Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969, 65973 (Oct. 19, 2026). Most recently, the CFTC issued a formal interpretation of its impartial access rules, explaining that "[t]he CEA and Commission Regulations generally do not permit a DCM to limit access based on the location of an otherwise eligible market participant within the United States." CFTC, *DCM Impartial Access Requirements* 4–6 (Nov. 5, 2026) ("Impartial Access Interpretation"). Missouri nevertheless demands that Polymarket US exclude otherwise eligible participants because they are located in Missouri.

6. Missouri's attempt to regulate Polymarket US is unlawful for a second, independent reason. On the theory that lawful derivatives are sports gambling, Defendants demand that Polymarket US's nationwide exchange contort itself to fit a state regulatory scheme designed for—and to protect—in-State casinos. New Missouri gaming licenses are available only to

"gambling boat[s]" and "sports team[s]" "located in this state." Mo. Const. art. III, § 39(g)4, 39(g)16(h). Assuming a license *were* available, Polymarket US's operations would not just have to be run from Missouri, *see* 11 CSR 45-20.290(5)—they would be limited to serving *only those physically present in Missouri*, cutting the company off from the rest of the United States, *see* Mo. Const. art. III, § 39(g)12. These discriminatory, balkanizing measures violate the Constitution's promise of "free trade among the several States." *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 335 (1977). And, under settled precedent, they are unlawful.

7. The threat to Polymarket US is immediate and concrete. On September 16, 2026, Defendant Missouri Attorney General Catherine Hanaway sent Polymarket US a cease-and-desist letter demanding that, within thirty days, Polymarket US either "cease and desist" from "offering sports wagering to individuals located in the State of Missouri" or "obtain a license from the Missouri Gaming Commission," "pay all associated state taxes and fees," and "stop offering sports wagering to persons in the State of Missouri under the age of 21." Ex. 1 at 1, 3. In the weeks following the letter, Polymarket US conferred with the Attorney General's office in an effort to resolve the State's demands without litigation. Those discussions were unsuccessful, and Polymarket US continues to face a real and imminent risk of enforcement, exposing it to civil penalties, forced cessation of operations within Missouri, and severe collateral consequences to its nationwide operations.

8. The harm resulting from state enforcement would be irreparable. Even a meritless state enforcement action would immediately disrupt Polymarket US's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, and harm Missouri residents. Even the *threat* of enforcement forces Polymarket US to choose between exercising its federal right to operate

nationwide and submitting to unlawful state coercion. The resulting disruption to a nationally uniform market cannot be remedied through damages. And the chilling effect on lawful activity and the deprivation of Missouri residents' access to a federally regulated exchange are precisely the harm Congress sought to prevent when it vested the CFTC with sole regulatory authority over derivatives traded on designated contract markets.

9. Defendants suffer no cognizable harm from being barred from enforcing laws in a domain the Constitution and Congress removed from state control. The State's local interests are already governed and safeguarded by the CFTC's exclusive federal oversight. By contrast, absent judicial intervention, Missouri's actions threaten to fracture a nationally uniform federal regulatory regime, disrupt lawful markets, burden interstate commerce, and deprive consumers of access to platforms Congress sought to protect. *See Minnesota*, 2026 WL 2150211, at *17 ("[W]hen the state law is likely preempted," "the harm to the state . . . is diminished" and "the public interest" "is less significant").

10. For these reasons, Polymarket US seeks declaratory and injunctive relief to prevent unlawful state overreach, maintain the integrity of the federal regulatory framework, and avert imminent harm that cannot be remedied after the fact.[1]

**JURISDICTION AND VENUE**

11. This is an action for declaratory and injunctive relief brought under 42 U.S.C. § 1983, and the Court's equitable powers, *see Ex parte Young*, 209 U.S. 123 (1908), to enforce the Supremacy Clause and the Commerce Clause of the United States Constitution. The federal

[1] This action does not seek to enjoin, suspend, or restrain the assessment, levy, or collection of any tax under Missouri law. *See* 28 U.S.C. § 1341; *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 11 (2015). Polymarket US challenges the State's authority to subject Polymarket US's federally regulated event contracts to Missouri's sports-wagering licensing requirements or otherwise regulate or prohibit activities governed exclusively by federal law. Polymarket US reserves all rights to challenge the assessment of any taxes, *see* Ex. 1 at 1, if necessary, in an appropriate forum.

questions presented are (1) whether Missouri state laws—including Missouri Constitution Art. III, Section 39(g)—that purport to regulate or prohibit Polymarket US's activities governed exclusively by federal law (or otherwise conflict with federal law) are preempted by the CEA; and (2) whether the same state law, as applied to Polymarket US, violates the Commerce Clause. This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

12. This Court has personal jurisdiction over Defendants. Defendants are domiciled and perform their duties in Missouri.

13. Venue is proper in this district under 28 U.S.C. § 1391(b). All Defendants are residents of the State of Missouri, and a substantial part of the events giving rise to these claims occurred in this District.

**PARTIES**

14. Plaintiff Polymarket US is a Delaware limited liability company with its principal place of business in New York. Polymarket US operates a derivatives exchange and prediction market where users can buy, sell, and exchange financial products known as event contracts. Polymarket US is a contract market that is federally licensed and regulated by the CFTC pursuant to the CEA.

15. Defendant Catherine L. Hanaway is the Attorney General of Missouri. This suit is brought against Attorney General Hanaway in her official capacity.

16. Defendant Jan M. Zimmerman is the Chairman of the Missouri Gaming Commission. This suit is brought against Chairman Zimmerman in her official capacity.

17. Defendant Kevin M. Spaulding is a Commissioner of the Missouri Gaming Commission. This suit is brought against Commissioner Spaulding in his official capacity.

18. Defendant Kevin Cantwell is a Commissioner of the Missouri Gaming Commission. This suit is brought against Commissioner Cantwell in his official capacity.

19. Defendant Sam Gladney is a Commissioner of the Missouri Gaming Commission. This suit is brought against Commissioner Gladney in his official capacity.

20. Defendant Roger Stottlemyre is a Commissioner of the Missouri Gaming Commission. This suit is brought against Commissioner Stottlemyre in his official capacity.

21. Defendants Hanaway, Zimmerman, Spaulding, Cantwell, Gladney, and Stottlemyre have the power and duty to enforce Missouri's laws, including the laws preempted by federal law and prohibited by the U.S. Constitution's Commerce Clause. Mo. Rev. Stat. §§ 27.060, 27.105; Mo. Const. art. III, § 39(g)9.

## FACTUAL AND LEGAL BACKGROUND

### A. Event Contracts Are Derivative Financial Instruments That Incorporate Real-Time Information to Generate Accurate Predictions About Real-World Events.

22. This case is about derivatives, financial instruments that derive their value from an underlying asset or event. Derivatives, the Supreme Court has long recognized, "are of the utmost importance to the business world." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 248–49 (1905).

23. One common kind of derivative is a "swap." Swaps are financial contracts where two parties agree to exchange (or swap) payments with each other based on a pre-agreed formula—say, the price of crude oil, interest rates, or the outcome of a real-world event.

24. An event contract, in turn, is a swap that is settled "based on the outcome of an underlying occurrence or event." CFTC, *Prediction Markets: Public Interest Determinations*, 91 Fed. Reg. 35806, 35807 n.1 (June 12, 2026); *see Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts.").

25. Event contracts allow participants "to manage price risks around whether events stated in the contracts will occur." 91 Fed. Reg. at 35807.

26. Events may relate to "sporting events, elections, official government action . . . the weather," or anything else of "potential financial, economic, or commercial consequence." *See* CFTC Complaint ¶¶ 3, 33, *United States v. Minnesota*, No. 26-cv-02661 (D. Minn. May 19, 2026), Dkt. No. 1 ("CFTC Minn. Compl."); 7 U.S.C. § 1a(47)(A)(ii).

27. Event contracts are nothing new. Since 1992, "Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on interests other than price-based interests," including interests "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669, 25671 (May 7, 2008). In 1993, for example, the Commission authorized the Iowa Electronic Markets to list contracts pegged to presidential elections. *Id.* at 25670 & n.5. In 2004, "the Commission first designated a prediction market as a designated contract market." 91 Fed. Reg. at 35807.

28. Event contracts often have a "binary payoff structure." 91 Fed. Reg. at 35807 n.1. One party takes the position that a particular event will occur (the "yes" position), and the other takes the position that the event will not occur (the "no" position). The terms of the contract specify its payout and expiration date. For example, the parties might take a position on whether St. Louis will get less than 3 feet of rain (the approximate yearly average) in 2026. At the end of the year, the party that correctly predicted the outcome is paid the agreed amount by the party that did not. If 2026 turns out to be an especially wet year and St. Louis sees 4 feet of precipitation,

the party that took the "yes" position on the weather contract would be paid and the party that took the "no" position would not.

29. Event contracts have any number of uses. For example, they can be used to "address[] categories of risk for which traditional financial instruments either do not exist or provide only imperfect hedges." 91 Fed. Reg. at 35866. To hedge against low summer attendance, for example, the St. Louis Zoo might purchase an event contract predicting that it will be a particularly rainy summer. If the weather turns out as the St. Louis Zoo predicted, the payout from the contract could help offset the Zoo's loss of income from lower attendance.

30. Event contracts can have enormous predictive value. Because they may be purchased and sold at any time before the expiration date, the price will reflect the trader's own expectations about the likelihood of a particular outcome. Consider the summer-rain market. As traders buy and sell positions on that market, the price of the contract changes to reflect traders' overall perception about the contract's value. If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price. When the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, and the price will drop with it. The result is that the price of the contract will reflect the overall market's view, in real time, about the probability of the outcome. And those probabilities are set by trading activity, not fixed odds. Even where the underlying market is based on, say, whether the Blues make the Stanley Cup Playoffs, this "structur[e]" is inherently "differ[ent]" from "gambling" on the same topic with a sportsbook. 91 Fed. Reg. at 65973.

31. As the CFTC observed in a recent notice of proposed rulemaking, prediction markets "are rapidly increasing in popularity with the American public both as a financial asset class and as a source of reliable information for news media, sports leagues, financial institutions,

and everyday Americans." 91 Fed. Reg. at 35807. Because traders put capital at stake, prediction markets incentivize accurate predictions. And because prediction markets enable real-time trading on a nationwide basis, they aggregate diverse perspectives and rapidly incorporate new information. As a result, prediction markets regularly outperform pundits and polls. *Id.* at 35831.

32. When it comes to "sports forecasting," for example, empirical studies show that prediction markets "strongly outperform" the experts. *E.g.*, M. Spann & B. Skiera, *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds and Tipsters*, 28 J. Forecasting 55, 65 (2009).[2]

33. The same is true of elections. Through the final days of the 2024 election campaign, for example, prediction markets accurately predicted President Trump would win a decisive victory, despite the view of many pollsters that the race would be considerably closer.[3]

34. Event contracts, like other derivatives, provide significant financial value and generate rich information. They allow parties to mitigate risk, although others are equally free to trade for speculative purposes: More participants means more liquidity, more efficient trading, and a greater predictive function. Event contracts supply investment opportunities for traders willing to put time and effort into thinking through the likelihood of occurrences in the real world. And, through the collective wisdom of these efficient, transparent markets, event contracts provide precise, real-time information about events that matter to the public at large.

---

[2] https://tinyurl.com/2zm5axpc.

[3] *See* Allison Morrow, *How prediction markets saw something the polls and pundits didn't*, CNN (Nov. 8, 2024), https://www.cnn.com/2024/11/08/business/polymarket-election-trump-nightcap; James Bickerton, *Mystery 'Trump Whale' Speaks Out After Winning $50 Million by Defying Polls*, Newsweek (Nov. 8, 2024, 10:57 AM), https://www.newsweek.com/trump-whale-trader-wins-50-million-election-polls-1982768.

**B. Over the Past Century, Federal Regulation of Exchange-Traded Derivatives Has Become Extensive—and Exclusive.**

35. For about as long as derivatives trading has existed in the United States, however, individual States have attempted to regulate or prohibit it as unlawful gambling. "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 393 (1982), is a direct result of those "coarse attempts" to manage our increasingly "complex society," *Christie Grain*, 198 U.S. at 247–48.

36. The federal government first intervened in 1922, requiring futures transactions for grain to be "consummated on an exchange designated as a 'contract market' by the Secretary of Agriculture." *Merrill Lynch*, 456 U.S. at 360–61.

37. Congress buttressed this federal scheme a decade later with the CEA but initially left the States a role in regulating these kinds of derivatives. It provided that the federal law would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act. Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936). States were therefore free to "supplement[] or bolster[] the federal scheme." *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 255 (1947).

38. By the 1970s, however, exchanges had become too important to the national economy to permit "[v]aried and often conflicting" state laws to interfere with national exchanges subject to federal control. 119 Cong. Rec. 41333 (1973). So Congress created the CFTC and enacted "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Merrill Lynch*, 456 U.S. at 356, "to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC," *Flaherty*, 172 F.4th at 230.

39. To that end, Congress provided that the CFTC would regulate "all" commodity futures when traded on a CFTC-designated contract market. Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974). Congress granted the CFTC "*exclusive jurisdiction* . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated" under the CEA. 7 U.S.C. § 2(a)(1)(A) (emphasis added). "The purpose of this was to separate the functions of the new CFTC from those of the SEC and other regulators," including state regulators. *Leist v. Simplot*, 638 F.2d 283, 314 (2d Cir. 1980); *see Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980) ("Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states.").

40. Courts immediately recognized "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC" from encroaching on the CFTC's federal authority. *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord, e.g.*, *Leist*, 638 F.2d at 322; *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980); *Westlake v. Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

41. State officials protested this change. A state securities commissioner from Minnesota bemoaned that, because the CFTC had "the authority to regulate" commodity markets "exclusively," courts had "precluded the application of state securities laws to any transactions involving commodities." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 383 (1978). By "giv[ing] exclusive jurisdiction over commodities regulation to the Commodity Futures Trading Commission," one Texas commissioner complained, Congress had "dismantled an effective regulatory system within the states." *Id.* at 363–64. And another Secretary of State demanded that

Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379.

42. Congress reaffirmed the preemptive effect of the CFTC's exclusive jurisdiction in 1982. When amending federal securities laws to preempt state gaming laws, members of Congress explained that a similar amendment to the CEA was unnecessary: "Similar application of state laws would not apply to futures contracts," because "the CEA gives the CFTC exclusive jurisdiction over futures trading thereby preempting state anti-gaming and bucket shop laws, as well as other state laws." H.R. Rep. No. 97-626, pt. 1, at 9 (1982) (Conf. Rep.).

43. Missouri, too, recognized the preemptive effect of the CFTC's jurisdiction just three years later by enshrining it in state law. Since 1985, Missouri commodity laws have expressly limited state regulation to transactions and contracts outside the CFTC's "exclusive jurisdiction" and exempted from their prohibitions any "transaction within the exclusive jurisdiction of the Commodity Futures Trading Commission as granted under the Commodity Exchange Act." Mo. Rev. Stat. § 409.806. Those laws expressly exclude from their reach any "contract market designated by the Commodity Futures Trading Commission." *Id.* § 409.800(12).

44. In 2000, Congress broadened the statutory definition of "commodity" to include any "occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." Pub. L. No. 106-554, app. E, § 101(4), 114 Stat. 2763, 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19)).

45. Following the 2008 financial crisis, Congress again changed the regulatory landscape. The Dodd-Frank Act of 2010 innovated and expanded CFTC authority in two ways most relevant here.

46. *First*, the Act added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction. As a result, the CFTC now exercises "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A).

47. Event contracts are covered by the Act because payment for event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (defining "swap").

48. *Second*, the Act introduced what is known as the "Special Rule," which supplies the CFTC the discretion—but not the obligation—to prohibit the trading of "[e]vent contracts" involving subjects including "terrorism," "assassination," "war," and "gaming," if it determines that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C). "By creating a specific public-interest review process, Congress signaled that these contracts fall within the [CFTC]'s exclusive regulatory purview, not the States'." CFTC Minn. Compl. ¶ 60.

49. Were there any doubt, Congress vested the CFTC with "exclusive authority to enforce" Dodd-Frank's swaps provisions, including the Special Rule governing event contracts. 7 U.S.C. § 6b-1(a). And, to ensure consistency and clarity, Congress directed the CFTC to "further define the term[] 'swap.'" 15 U.S.C. §§ 8302(d)(1), 8321(b). All told, the CEA grants the CFTC "exclusive jurisdiction" to regulate exchange-traded event contracts, to determine whether they involve "gaming," and to prohibit them based on the CFTC's view of the public interest. 7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C).

50. The CFTC has recently exercised its statutory authority to further define the term "swap." On October 9, 2026, the CFTC issued an interim final rule confirming that "wagers

placed on sportsbooks and casino games" are outside the ambit of the agency's regulatory authority, and that "tradable instruments," including "[e]vent contracts," remain well within the CFTC's exclusive jurisdiction. 91 Fed. Reg. at 65971, 65973.

51. The same day, the CFTC published a notice of proposed rulemaking to ensure that the definition of "swaps" includes sports-, politics-, culture-, and weather-related event contracts, confirming that these contracts are within the agency's exclusive jurisdiction. *Further Definition of "Swap"- Inclusions*, 91 Fed. Reg. 66022 (Oct. 19, 2026).

**C. The CEA Sets Forth the Comprehensive Regulatory Framework for Event Contracts.**

52. The CFTC exercises its exclusive jurisdiction through a comprehensive regulatory framework. Certain derivatives trading in the United States must take place on a board of trade that the CFTC has designated as a contract market. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a). That designation reflects a rigorous federal determination that the contract market satisfies extensive requirements governing market integrity, transparency, financial safeguards, and customer protection.

53. The CFTC-designation process is a demanding one because contract markets are charged with a broad array of functions that the CFTC itself would otherwise have to perform. To obtain approval to operate a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles." 17 C.F.R. § 38.3(a)(2); *see* 7 U.S.C. §§ 7(d), 8(a). Core principle 1 requires the contract market to comply with *all* CFTC regulations. *See* 17 C.F.R. § 38.100(a)(2). And core principle 2 requires that the entity be "transparent" in its criteria for accessing the market, *id.* § 38.151(b)(1), prohibit abusive, "manipulative[,] or disruptive trading practices," *id.* § 38.152, "maintain an automated trade surveillance system capable of detecting and investigating potential trade practice violations" based on "specific trade execution patterns and trade anomalies," *id.* § 38.156, and "conduct real-time market monitoring

of all trading activity on its electronic trading platform(s) to identify disorderly trading and any market or system anomalies," *id.* § 38.157.

54. The remaining core principles provide further protection against contract manipulation, ensure that risk controls are in place to limit market disruptions, and require daily publication of the price and volume of actively traded contracts. *See* 17 C.F.R. §§ 38.200–38.301; 7 U.S.C. § 7(d)(8). For example, a designated contract market must "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market" and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A). And those rules must provide "impartial access to its markets and services" using "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). These rules, the CFTC has explained, "establish important protections for derivatives markets, market participants, and the general public." CFTC Minn. Compl. ¶ 43.

55. On November 5, 2026, the CFTC issued an interpretation of those impartial access requirements. *See* Impartial Access Interpretation, *supra*. The Commission explained that, because Congress identified a "national public interest" in derivatives markets, 7 U.S.C. § 5(a), those markets "must operate on a uniform basis at a national scale in order to achieve the CEA's purpose." *See* Impartial Access Interpretation, *supra*, at 4. It therefore concluded that "[t]he CEA and Commission Regulations generally do not permit a DCM to limit access based on the location of an otherwise eligible market participant within the United States," and that "geographic access restrictions are inconsistent with the CEA and Commission rules and regulations." *Id.* at 4, 6. The Commission catalogued the harms such restrictions cause: fragmenting "a national pool of liquidity," impairing "price discovery" and "overall efficiency," and "rais[ing] significant

concerns for both financial integrity and risk management within derivatives markets." *Id.* at 5–6. The Commission "expects DCMs to evaluate their access criteria, exchange rules, and intermediary access arrangements to ensure compliance." *Id.* at 6.

56. In short, to obtain designation as a contract market, applicants must show that they can be trusted to establish, monitor, and enforce rules for the markets they operate. As the CFTC has explained, contract markets are "self-regulatory organizations[] subject to Commission oversight" that must "meet[] the stringent requirements" under the CEA. 91 Fed. Reg. at 35,843; *see* 7 U.S.C. § 5(b) (purpose of the CEA is to "serve the public interest[] . . . through a system of effective self-regulation of trading facilities").

57. Designated contract markets may not list new kinds of contracts on their exchanges without first submitting the contract for CFTC approval or certifying that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). Before listing a new contract, the designated contract market must supply the CFTC with a "certification . . . that the product to be listed complies with the [CEA]" and CFTC regulations, as well as "[a] concise explanation and analysis"—with accompanying documentation—"with respect to the product's terms and conditions" and "the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations," among other things. 17 C.F.R. § 40.2(a); *see* 7 U.S.C. § 7a-2(c)(1).

58. More broadly, the CFTC wields considerable tools for enforcing the CEA and its regulations. For example, the CEA empowers the agency to subpoena testimony and documents, 7 U.S.C. § 9(5), bring administrative enforcement actions, *id.* §§ 9(4), 13b, and sue in federal court for injunctive relief, monetary penalties, the appointment of receivers, disgorgement,

restitution, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

**D. The CFTC Licenses Polymarket US as a Designated Contract Market Subject to Federal Law and the CFTC's Exclusive Jurisdiction.**

59. The CFTC granted Polymarket US its designation as a contract market on July 9, 2025, finding that the platform now doing business as Polymarket US could and would comply with the CEA and the CFTC's regulations. Order of Designation, *In re Application of QCX LLC for Designation as a Contract Market*, Commodity Futures Trading Comm'n (July 9, 2025).

60. Today, Polymarket US specializes in contracts concerning real-world events of public interest. Since September 30, 2025, Polymarket US has self-certified various financial, election-related, and sports-related event contracts. *See* 7 U.S.C. § 7a-2(c); CFTC, Designated Contract Market Products (listing self-certifications for contracts).[4]

61. These event contracts fall within the heart of the CFTC's exclusive jurisdiction. Payment on one of Polymarket US's listed event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

62. One example is event contracts based on which political party will control the United States Senate or United States House of Representatives following the November 3, 2026, elections. Businesses, investors, financial institutions, and consumers routinely adjust their behavior based on which party will control Congress because legislative control can affect taxation, spending, regulation, and other matters with significant economic effects.

[4] https://tinyurl.com/yamausyk.

63. Another example is event contracts based on the winner of the Super Bowl. The Super Bowl's "associat[ion] with a potential financial, economic, or commercial consequence" is obvious. 7 U.S.C. § 1a(47)(A)(ii); *see Coinbase*, 2026 WL 2969682, at *7 ("Winning a title game likely 'associate[s] with a potential financial, economic, or commercial consequence.'"). Winning the Super Bowl causes a team's valuation to surge, retailers' sales of merchandise of that team to skyrocket, and hometown sales to spike. In 2023, for example, the Chiefs' successful season brought in nearly $1 billion to the Kansas City region.[5] Retailers also regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[6]

64. As the CFTC has explained, sports-related event contracts are not the same as sportsbooks. The "essential structural characteristics" and regulatory regimes differ in fundamental ways. 91 Fed. Reg. at 65973.

65. Event-contract prices are "market-set"—formed by matching buyers and sellers among diverse market participants, with users from any given State transacting with other users around the country on these nationwide exchanges. 91 Fed. Reg. at 65973. Sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook "unilaterally dictat[ing]" the terms of its wagers. *Id*. The incentives in sports betting and derivatives markets are different, too. Sportsbooks set "odds" based on proprietary

---

[5] *See Chiefs Release Record Economic Impact of Nearly $1 Billion for the Kansas City Region* (Feb. 1, 2024), https://www.chiefs.com/news/chiefs-release-record-economic-impact-of-nearly-1-billion-for-the-kansas-city-region.

[6] *See, e.g.*, *Buffalo Wild Wings (@bwwings)*, Instagram (Feb. 8, 2026), https://www.instagram.com/p/DUgIPoekVo8/ (promising free wings if Super Bowl goes to overtime); St. Louis Blues, *When the Blues Win, You Win This Season* (Oct. 11, 2025), https://www.nhl.com/blues/news/when-the-blues-win-you-win-this-season (describing offers fans can redeem the day after the Blues win a game, including a free small Frosty at Wendy's); Kansas City Royals, *Hittin' Dingerz, Eatin' Chikin'*, https://www.mlb.com/royals/fans/sponsor-offers/chick-fil-a (promising attendees of Royals games a free five-piece Chick-fil-A nugget when the Royals turn a double play in the second inning) (last visited Oct. 5, 2026).

information to the advantage of the sportsbook and the disadvantage of the bettor; event contracts are priced "by a competitive, open, and efficient market" without any input by Polymarket US—*i.e.*, buying and selling activity reflecting the diverse perspectives of millions of individual traders as to a given event. *Id.* at 65973, 65975 (internal quotation marks omitted). And sports bettors typically place wagers against the "house," so sports bettors and sportsbooks are counterparties to the bet. *Id.* at 65972. Polymarket US, however, does not operate as a counterparty in the derivatives market. Instead, it operates as a transparent, centralized exchange matching orders of third parties. *Id.* at 65973. Polymarket US makes money by charging a flat fee for each transaction; unlike a sportsbook, it does not make money when a bettor loses, and it makes the same amount regardless of the outcome of a particular event. *Id.* at 65974.

66. Federal law governs event contracts of all kinds—including sports-related ones—traded on designated contract markets. That is, all derivative instruments listed on centralized exchanges operate pursuant to extensive federal product certification, registration, and approval procedures. Sports-event contracts, like any other "transactions subject to" the CEA, "are entered into regularly in interstate . . . commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). They are therefore traded on a national exchange and regulated on the national level to ensure "trading in liquid, fair and financially secure trading facilities." *Id.*

### E. The CFTC Has Vigorously Defended Its Exclusive Jurisdiction Over Designated Contract Markets.

67. The CFTC has resisted States' attempts to encroach upon its exclusive jurisdiction over designated contract markets. It has publicly advocated for its exclusive

prerogative to regulate event contracts, assertively pursued litigation, and acted as an amicus in support of private parties' fights against states' jurisdictional overreach.

68. Earlier this year, CFTC Chairman Selig reiterated that "prediction markets" and "event contracts" "have operated within the CFTC's regulatory perimeter for more than two decades" and have played an "important role . . . in the broader financial system."[7] He warned that state litigation against federally regulated markets injects uncertainty that "has not served our markets well" and harms "the public interest." *Id.* To protect its jurisdiction, he directed the CFTC to reassess its litigation posture in cases implicating jurisdictional boundaries, emphasizing that where "jurisdictional questions" arise, "the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives." *Id.*

69. The CFTC has followed through with this warning. In recent months, the Commission has sued numerous States that have sought to outlaw, regulate, or otherwise restrain federally regulated prediction markets.[8]

70. The CFTC explained that those state efforts "intrude[] on the exclusive federal scheme Congress designed to oversee the derivatives industry," and would "undermine[] [the] uniformity" Congress mandated, *see* CFTC Minn. Compl. ¶¶ 7, 82, by subjecting CFTC-regulated exchanges to a "fragmented patchwork of state regulations" that have "resulted in poorer consumer protection and increased risk of fraud and manipulation," CFTC Press Release No. 9206-26, *CFTC*

---

[7] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

[8] *See*, *e.g.*, Complaint, *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. No. 1; Complaint, *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1; Complaint, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1; CFTC Minn. Compl.; Mot. to Intervene & Proposed Compl. in Intervention, *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), Dkt. No. 19; Complaint, *United States v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026), Dkt. No. 1 ("CFTC N.M. Compl.").

*Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets* (Apr. 2, 2026).[9] The CFTC also emphasized that event contracts traded on designated contract markets are "swaps" within the meaning of the CEA and fall squarely within the CFTC's exclusive jurisdiction, which prohibits States from "invad[ing]" that authority. *See*, *e.g.*, CFTC Minn. Compl. ¶¶ 9, 32. Those federally regulated markets include Polymarket US. *See id.* ¶ 44.

71. The result would be a "massive sea change" that poses "existential" harm to national markets. CFTC Amicus Brief 20, 28, *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. Sept. 9, 2026), Dkt. No. 51.1 ("CFTC Amicus Br."). The CFTC's suits and motions for preliminary injunctions against states like Illinois, New York, Rhode Island, New Mexico, Wisconsin, and Minnesota thus aim "to halt [state] efforts to prohibit the operation of derivatives markets governed by federal law." *E.g.*, CFTC N.M. Compl. ¶ 1.[10]

72. Another court in this Circuit recently preliminarily enjoined Minnesota from enforcing state law against CFTC-regulated contract markets, including Polymarket US. *Minnesota*, 2026 WL 2150211, at *10–15. Focusing on 7 U.S.C. § 2(a)(1)(A), the court held that the CEA's "exclusive jurisdiction" language likely expressly preempts state regulation of event contracts that qualify as "swaps," and emphasized the statute's broad definition of that term: An event contract qualifies where "the occurrence of an event has the capacity to result in the identified consequence in the future." *Id.* at *12–15. Most recently, the Northern District of Illinois preliminarily enjoined Illinois from enforcing state law against a subset of sports-related contracts

---

[9] https://www.cftc.gov/PressRoom/PressReleases/9206-26.

[10] *See* Motion for Preliminary Injunction, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026), Dkt. No. 34; Motion for Prelim. Inj., *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026), Dkt. No. 25; Mot. for Prelim. Inj., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. May 29, 2026), Dkt. No. 23; Mot. for Prelim. Inj., *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. June 17, 2026), Dkt. No. 31; Mot. for Prelim. Inj., *United States v. New Mexico*, No. 26-cv-1912 (D.N.M. June 18, 2026), Dkt. No. 13.

"dependent on who will win or lose a title game." *Coinbase*, 2026 WL 2969682, at *5. In granting the preliminary injunction motion, the court concluded that the state laws Illinois attempted to enforce against prediction markets "likely conflict[] with the [CEA] and [are] accordingly likely preempted." *Id.* at *16.

**F. Defendants Pursue Polymarket US and Other Events-Market Operators for State-Law Penalties.**

73. Whereas the CFTC regulates nationwide derivatives markets, the Missouri Gaming Commission regulates sports wagering—under a regime designed to favor local businesses and prevent interstate competition.

74. Missouri issues its mandatory sports-wagering licenses only to "an owner of an excursion gambling boat located in this state," or an operator acting on that owner's behalf; to "a professional sports team," defined as "a team located in this state," or the team's designated operator; or to one of "not more than two" "direct" licensees selected through a competitive process. Mo. Const. art. III, § 39(g)4.b, 39(g)4.c, 39(g)16(h); 11 CSR 45-20.020(1); 11 CSR 45-20.050. Both direct licenses have been awarded, *see* Mo. Gaming Comm'n Res. No. 25-139 (Aug. 15, 2025), so the only path to a Missouri license today runs through affiliation with a gambling boat or sports team located in Missouri.

75. These laws serve no apparent purpose beyond protectionism. If the State's concern was licensee suitability, for example, the Missouri Gaming Commission *separately* conditions licensure on key-person, financial, integrity, and responsible-gaming requirements. Mo. Const. art. III, § 39(g)5, 39(g)9; 11 CSR 45-20.030–.040; 11 CSR 45-20.100. Mobile license applicants must disclose significant ownership and control interests, submit to background investigations, and provide plans for the promotion of responsible gaming. Mo. Const. art. III, § 39(g)5, 39(g)9. Applicants must also maintain internal operational controls, recordkeeping

systems, and procedures for detecting and preventing fraud. 11 CSR 45-20.060; 11 CSR 45-20.100.

76. To place local businesses at a further competitive advantage, the Missouri Gaming Commission's rules require that the "[s]ervers used to receive transmissions of requests to place wagers and to transmit confirmations of accepted wagers" "be physically located in the state of Missouri." 11 CSR 45-20.290(5).

77. There is no obvious non-protectionist rationale for this requirement, either. It is not required by Missouri's constitution, which permits those servers to be located "in this state, or any other location approved by the Commission and consistent with federal law." Mo. Const. art. III, § 39(g)11. And the Commission's own rules permit backup servers to be located anywhere in the United States, 11 CSR 45-20.290(5); permit an operator's "information technology environment and infrastructure" to be maintained in "a comprehensive cloud computing platform or data center" without geographic limitation, 11 CSR 45-20.220(4); permit backup data to be kept in "cloud storage located in the United States," 11 CSR 45-20.220(18); and guarantee the Commission "remote, read-only, real-time access to the sports wagering system" wherever it sits, 11 CSR 45-20.290(2).

78. But that is not all. If a sportsbook wishes to do business in Missouri, it may serve only those in Missouri. The Missouri Constitution requires that "[a]ll wagers authorized under [Missouri's licensing scheme] must be initiated, made, or otherwise placed by a bettor while physically present within this state" and that online sports-wagering operators employ "geolocation and geofencing technology to ensure that it accepts bets only from customers who, at the time of placing the bet, are physically present in this state." Mo. Const. art. III, § 39(g)12.

79. Missouri officials apparently believe that this balkanized, protectionist regime should apply to interstate derivatives trading.

80. On September 16, 2026, the Missouri Attorney General sent Polymarket US a cease-and-desist letter asserting that Polymarket US "is an online sports wagering platform" that "has been—and continues to be—in violation of Missouri law" because it has not "submit[ted] to regulation by the Missouri Gaming Commission as required by Missouri law." Ex. 1 at 1. The letter presents Polymarket US with "two options": either "cease and desist" from offering event contracts to persons located in Missouri; or "(a) obtain a license from the Missouri Gaming Commission, (b) pay all associated state taxes and fees, and (c) stop offering sports wagering to persons in the State of Missouri under the age of 21." *Id.* It warns that, if Polymarket US does not provide confirmation of compliance or cease all operations in Missouri "within thirty days of the date of th[e] letter," the State of Missouri "will pursue available enforcement actions against Polymarket [US]." *Id.* at 1, 3.

81. The State's theory is that Polymarket US's federally regulated event contracts are "sports wagering" within the meaning of Article III, Section 39(g) of the Missouri Constitution, and therefore subject Polymarket US to Missouri's sports-wagering regime. On that basis, the State demands that Polymarket US obtain a license from the Missouri Gaming Commission and submit to the Commission's regulatory oversight, including state requirements governing the operation of its markets, financial records and internal controls, geolocation, responsible gaming, and customer eligibility. *See* Mo. Const. art. III, § 39(g)5, 39(g)9, 39(g)11–14. The State also demands that Polymarket US pay licensing fees and a ten-percent wagering tax on adjusted gross revenue and prohibit persons under 21 from trading sports-event contracts. *Id.* § 39(g)3, 39(g)6,

39(g)10.a. The State asserts that, unless Polymarket US complies with those requirements, "it will not be permitted to offer the use of its online sports wagering platform in Missouri." Ex. 1 at 2.

82. The State argues that "the CEA does not preempt state law" governing sports gambling and that sports-related event contracts "do not qualify as 'swaps' under the CEA." Ex. 1 at 2. The State's position on preemption conflicts with decades of case law holding that the CEA preempts state law, as well as with more recent decisions confirming that the CEA's preemptive force extends to event contracts traded on CFTC-designated contract markets. *See Flaherty*, 172 F.4th at 227–28; *Minnesota*, 2026 WL 2150211, at *11–12; *Coinbase*, 2026 WL 2969682, at *16. The assertion that Missouri may regulate "transaction[s] within the exclusive jurisdiction of the Commodity Futures Trading Commission" conflicts with the Missouri Legislature's determination to the contrary. Mo. Rev. Stat. § 409.806. The notion that event contracts are not swaps conflicts with the CFTC's own considered views, many of which carry the force of law. *See* 91 Fed. Reg. at 65971, 65973–74 (interim final rule); 91 Fed. Reg. at 66025 (proposed rule). And the suggestion that a State may unilaterally determine what counts as a swap contradicts Congress' decision to vest *the CFTC* with "exclusive authority to enforce the provisions" of federal law concerning swaps and to empower *the CFTC* to "further define" that term. 7 U.S.C. § 6b-1(a); 15 U.S.C. § 8302(d)(1).

**G. Looming Enforcement of Discriminatory, Preempted Missouri Law Irreparably Harms Polymarket US's Business.**

83. In the weeks following the letter, Polymarket US conferred with the Attorney General's office in an effort to resolve the State's demands without litigation. Those discussions were unsuccessful, and with the State's thirty-day deadline now passed, Polymarket US continues to face an imminent threat of enforcement. Polymarket US does not hold a Missouri sports wagering license because Missouri may not lawfully require a CFTC-designated contract market

to obtain one as a condition of listing federally regulated event contracts. Nor, given the State's discriminatory licensing regime, could Polymarket US readily obtain such a license if it tried. And, given Missouri's similarly discriminatory, blanket ban on interstate transactions, Polymarket US certainly could not comply with Missouri law without fundamentally altering its product—from an interstate exchange into a one-State gambling portal.

84. The threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy. Because Polymarket US must choose between protecting its rights under federal law and facing exposure to imminent state enforcement, this action is ripe for adjudication and the award of injunctive relief now, not after irreparable harm has occurred.

85. The business consequences for Polymarket US arising from Missouri's near-certain enforcement require this Court's immediate action. An enforcement action by Missouri—even a meritless one—would raise a red flag for Polymarket US's business partners, triggering notification and termination clauses in many of Polymarket US's agreements, and jeopardizing key partnerships crucial to the company's growth. Additionally, Polymarket US would lose out on potential business partners who would steer clear of a company under a cloud of enforcement proceedings.

86. The alternative—abruptly terminating Missouri users' access to event contracts and unwinding their current positions—is just as damaging. Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation. Cutting off Missourians from Polymarket US's event contracts—contracts that are available to users outside Missouri—would deal a decisive blow to Polymarket US's goodwill and reputation within the State. It would disrupt overall liquidity and impair the information that trading generates by forcing Missouri

residents off the exchange. And it would create confusion among users about what shutting off their access to the market means for their trading positions. Unwinding existing contracts, in particular, would confuse and frustrate both Missourians and users on the other side of the contracts.

87. Further, reduced liquidity would deter customers nationwide from using the platform. Price discovery and market efficiency are two main reasons why event contracts have predictive value (and thus why Polymarket US is attractive to users). Reduced liquidity dampens both, meaning that termination of Missouri-based trading hinders the orderly functioning of markets nationwide and could deter customers outside Missouri from using the platform at all, imposing substantial burdens on interstate commerce. The CFTC has identified these precise consequences: geographic restrictions may "fragment a national pool of liquidity" and produce "wider bid-ask spreads, raising the cost of trading for all participants." Impartial Access Interpretation, *supra*, at 5. For example, contracts concerning "whether a home team advances to its playoffs" may attract disproportionate regional interest, and excluding that region's traders "could decrease the contracts' overall liquidity." *Id.* Election markets are similarly "particularly sensitive" to geographic restrictions because "restricting access to a particular State's residents could severely undercut volume and/or the information-discovery function of any market concerning an election in that State." *Id.* at 6. Excluding Missouri participants would thus impair nationwide markets, harming participants both within and outside the State.

88. All told, "the prospect of" an imminent enforcement action irreparably harms Polymarket US by putting it to an impossible choice: continue operations "and expose [itself] to potentially huge [criminal] liability," on the one hand; or "suffer the injury of obeying the [preempted] law," on the other. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82

(1992); *see Coinbase*, 2026 WL 2969682, at *17 (prediction markets "must choose between ceasing business operations and facing imminent civil and criminal penalties under laws that are likely preempted"). There is therefore "no adequate remedy at law." *Morales*, 504 U.S. at 381.

**COUNT I**
**Commodity Exchange Act Preemption**
**(42 U.S.C. § 1983; *Ex parte Young*)**

89. Polymarket US incorporates the preceding paragraphs by reference.

90. The Supremacy Clause of the United States Constitution enshrines the "Laws of the United States" as "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

91. "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quotation omitted).

92. "[F]ederal law may supersede state law in several different ways." *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 357 (8th Cir. 1993). "Congress is empowered to pre-empt state law by so stating in express terms." *Id.* "In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive." *Id.* And "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Id.* at 358.

93. Polymarket US brings this claim pursuant to 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), and seeks declaratory and injunctive relief preventing Defendants from enforcing Missouri law against Polymarket US in violation of federal law. As explained

below, Missouri's gaming laws are preempted by the CEA as applied to Polymarket US's federally regulated exchange.

94. The CEA bars Missouri from purporting to regulate Polymarket US's federally regulated offering of event contracts under each form of preemption.

**A. Express Preemption Bars Missouri Regulation of Polymarket US's Exchange.**

95. Congress expressly preempted state regulation of event-contract trading on designated contract markets.

96. Under the CEA's express terms, the CFTC, not Missouri, has "exclusive jurisdiction with respect to" all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A).

97. Confirming as much, the very next sentence explains that the section does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States or of any State," "*[e]xcept as hereinabove provided*." 7 U.S.C. § 2(a)(1)(A) (emphasis added).

98. The CFTC's "exclusive jurisdiction" over trading on federally regulated event-contract exchanges, 7 U.S.C. § 2(a)(1)(A), therefore preempts Missouri's supposed jurisdiction to police those exchanges, *see Minnesota*, 2026 WL 2150211, at *10 ("[C]ourts have recognized that § 2(a)(1)(A)'s 'exclusive jurisdiction' language has a preemptive effect on state regulation."); *Flaherty*, 172 F.4th at 230 (observing that the CEA's "text preempts state gambling laws that seek to regulate . . . event contracts traded on a [contract market]" under the CFTC's exclusive jurisdiction).

99. In addition, Section 13a-2 of the CEA bars Missouri from enforcing its gambling laws against a designated contract market. Congress defined the extent of state authority to proceed against conduct the CEA regulates. 7 U.S.C. § 13a-2. A State may sue a person who

violates the CEA or CFTC regulations, but Congress expressly excluded "contract market[s]" from that authority. *Id.* § 13a-2(1). And Congress preserved only one category of state law actions, namely proceedings brought under a State's "general civil or criminal antifraud statute." *Id.* § 13a-2(7).

100. These two limitations foreclose Missouri's threatened enforcement. First, Congress excluded contract markets by name. 7 U.S.C. § 13a-2(1). Congress withheld that authority to sue because "[p]lenary authority to register, regulate, and discipline the contract markets" is "reserved to the Commission." S. Rep. No. 95-850, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2113. Congress could not have intended to deny States authority to enforce the CEA against contract markets while simultaneously permitting them to achieve the same result through state gambling laws. *See Kelly*, 691 F.2d at 803 n.8. Second, Congress preserved only those state actions brought under "general civil or criminal antifraud statute[s]." 7 U.S.C. § 13a-2(7). When Congress specifically identifies the state law claims that may coexist with a federal regulatory scheme, the remainder are preempted. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 163 (1982).

101. Missouri says that Polymarket US is "offering sports wagering." Ex. 1 at 1. That is not true. Moreover, the CEA's Special Rule anticipates that certain "event contracts" will "involve . . . gaming" and authorizes the CFTC to ban the trading of those contracts. 7 U.S.C. § 7a-2(c)(5)(C). Thus, even if sports-event contracts were a form of gaming (they are not), they would remain within the CFTC's exclusive jurisdiction and beyond the State's regulatory reach.

**B. Implied Field Preemption Bars Missouri Regulation of Polymarket US's Exchange.**

102. Field preemption applies where Congress has occupied an entire regulatory field, leaving no room for supplemental state regulation. *See Arizona v. United States*, 567 U.S. 387, 401 (2012). Through the CEA, Congress has done just that for event-contract trading on

designated contract markets. "As the scope of the CEA and the long history of amendments to it make clear, Congress created 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" CFTC Minn. Compl. ¶ 89 (quoting *Merrill Lynch*, 456 U.S. at 356).

103. "Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. And through this "grant[] [of] exclusive jurisdiction to the Commodity Future[s] Trading Commission," together with the "pervasive regulatory scheme established under the Commodity Exchange Act," as amended, Congress achieved its goal of "preempt[ing] the field insofar as futures regulation is concerned." *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982).

104. The field occupied by federal law expanded when the Dodd-Frank Act "amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (footnote omitted) (quoting 78 Fed. Reg. 33476, 33477 (June 4, 2013)). The CFTC is exercising that authority to confirm that "event contracts" are swaps and that casino gambling transactions, including sports wagers, are not. *See* 91 Fed. Reg. at 66025; 91 Fed. Reg. at 65971.

105. There is no room for state interference with this "comprehensive scheme." *CFTC v. Brit. Am. Commodity Options Corp.*, 560 F.2d 135, 138 (2d Cir. 1977).

106. Enforcement of Missouri's sports wagering or gambling laws against Polymarket US would impermissibly intrude on the CFTC's exclusive authority to police trading

on CFTC-regulated exchanges. *See*, *e.g.*, *Flaherty*, 172 F.4th at 228 (holding that "at the very least[,] field preemption applies" to sports-related event contracts on a designated contract market).

**C. Conflict Preemption Bars Missouri Regulation of Polymarket US's Exchange.**

107. Conflict preemption also prevents enforcement of these Missouri laws against Polymarket US because those laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000); *see also Flaherty*, 172 F.4th at 229 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed [designated contract markets].").

108. Consider the State's position that Polymarket US's federally regulated sports-event contracts are unlawful "online sports wager[s]" and contrary to "the public interest" in "a well-regulated sports wagering industry." Ex. 1 at 1–2. That is not the State's decision to make: The CEA grants the *CFTC* the authority to "determine[]" whether such contracts "involve . . . gaming" and, if so, whether they should be prohibited as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

109. Common sense confirms all this. The Chicago Mercantile Exchange, for example, is not the MGM Grand, though a customer of either might end up losing money. But if States were free to regulate derivatives as gambling—subject to each State's rigid-yet-idiosyncratic restrictions and licensing regimes—the modern financial system would cease to function. The CEA ensures that this cannot happen.

110. The CFTC has not invoked this Special Rule to prohibit Polymarket US from listing sports-event contracts. Therefore, Polymarket US's event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them. *See Flaherty*, 172 F.4th at 226 ("The Act preempts state laws that directly interfere with swaps traded

on [contract markets].”). Were there any doubt, the CFTC is finalizing regulations *confirming* that these event contracts ordinarily will not be prohibited under the Special Rule. *See* 91 Fed. Reg. at 35818, 35835.

111. More broadly, if Missouri attempts to ban Polymarket US’s event contracts that federal law and the CFTC have authorized, the State’s actions would plainly frustrate the CFTC’s exclusive authority to regulate its designated exchanges. As the Supreme Court has recognized, “[t]he purpose of the exclusive-jurisdiction provision” is, among other things, to “separate the functions of the [CFTC] from those of . . . other regulatory agencies.” *Merrill Lynch*, 456 U.S. at 386. Permitting a Missouri enforcement action against Polymarket US would conflict with Congress’s goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes—a conflict that becomes clearer still when one considers that nothing would stop the 49 other States and the District of Columbia from equally attempting to subject Polymarket US’s exchange to their own varying laws. “This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC.” *Flaherty*, 172 F.4th at 230. The CFTC has said the same: Because Congress identified a “national public interest” in derivatives trading, those markets “must operate on a uniform basis at a national scale in order to achieve the CEA’s purpose.” Impartial Access Interpretation, *supra*, at 4 (quoting 7 U.S.C. § 5(a)). What’s more, the CFTC explained state efforts to undermine the CFTC’s exclusive jurisdiction over event contracts “threatens to wreak havoc on the operations of [contract markets] nationwide” and “imperil a nascent industry that Congress has entrusted to the [agency’s] ‘exclusive jurisdiction.’” 91 Fed. Reg. at 65971, 65977.

112. Compliance with both regimes is also impossible in practice. Federal law requires a designated contract market to provide “impartial access to its markets and services” on

a non-discriminatory basis, 17 C.F.R. § 38.151(b), and the CFTC has explained that a contract market that restricts access by geography in order to comply with state gambling laws violates that requirement, CFTC Amicus Br. 18; Impartial Access Interpretation, *supra*, at 4. Missouri's demand that Polymarket US "stop offering" sports-related event contracts "to persons in the State of Missouri," Ex. 1 at 1, would require Polymarket US to do exactly that. So would compliance with the State's licensing regime, which compels participants to serve only those in Missouri, at the expense of residents of every other State. Mo. Const. art. III, § 39(g)12.

113. In short, Missouri may not enforce against Polymarket US state laws that federal law preempts.

**COUNT II**
**Violation of the Commerce Clause**
**(42 U.S.C. § 1983)**

114. Polymarket US incorporates the preceding paragraphs by reference.

115. Missouri's threatened enforcement action, like the underlying state-licensing regime, violates the U.S. Constitution's Commerce Clause by discriminating against out-of-State commerce.

116. The "negative implication" of Congress's "authority to regulate interstate commerce" is that "[S]tates may not enact laws that discriminate against" such commerce. *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003).

117. Laws that "overtly discriminate[] against interstate commerce"—facially, through a "discriminatory purpose," or because of their "discriminatory effect," *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006) (internal quotation marks omitted)—"face a virtually *per se* rule of invalidity," *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (internal quotation marks and citation omitted).

118. Missouri demands that Polymarket US "obtain a license from the Missouri Gaming Commission" and comply with state law governing "online sports wagering platform[s]," Ex. 1 at 1, but that sports-wagering regime is discriminatory from beginning to end.

119. Start with Missouri's licensing restrictions. Online sports-wagering licenses are available only to in-State "excursion gambling boat[s]," in-State "sports team[s]," or operators acting on those in-State businesses' behalf. Mo. Const. art. III, § 39(g)4.b. "Thus, physical presence in the state is the distinguishing factor that gives in-state [businesses] benefits that out-of-state [businesses] do not share," making the licensing regime "facially discriminatory." *Novartis Pharms. Corp. v. Griffin*, 833 F. Supp. 3d 956, 989–90 (E.D. Ark. 2026).

120. The provision also discriminates against out-of-State business in practical effect. Imposing on out-of-State businesses the obligation to partner with an in-State business imposes costs on out-of-State businesses that in-State competitors need not bear—again, in violation of the Commerce Clause. *See, e.g.*, *Granholm*, 544 U.S. at 474 (regulatory scheme was unconstitutional because it "require[d] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers").

121. The State's discriminatory licensing provision is not "narrowly tailored to advance a legitimate," "nonprotectionist" "local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518, 539 (2019) (internal quotation marks and citation omitted). Separate from the provision, Missouri subjects every licensee to suitability, key-person, financial, integrity, and responsible-gaming requirements. Mo. Const. art. III, § 39(g)5, 39(g)9; 11 CSR 45-20.030–.040, -20.100. And it is "mere speculation" to suppose that partnering with a gambling boat or sports team is necessary—much less "narrowly tailored"—to advance some legitimate, non-protectionist purpose. *Tenn. Wine*, 588 U.S. at 518, 539.

122. Missouri law imposes another unlawful physical-presence requirement. The obligation that licensees' "server[s]" "be physically located in the state of Missouri," 11 CSR 45-20.290(5), compels an out-of-State business like Polymarket US that operates a single nationwide market from centralized infrastructure to build and operate a duplicate Missouri installation as the price of serving Missouri residents.

123. This is precisely the kind of restriction that the Supreme Court has long "viewed with particular suspicion"—a rule "requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Granholm*, 544 U.S. at 475.

124. Nor, as state law confirms, is this restriction necessary: Both the Missouri Constitution and the Commission's own rules make clear that out-of-State storage is viable and compatible with whatever state interest the Commission might seek to advance. *See* Mo. Const. art. III, § 39(g)11; 11 CSR 45-20.220(4), (18); 11 CSR 45-20.290(5).

125. In addition to its unlawful physical-presence requirements, Missouri's licensing regime erects a barrier to interstate commerce through its geofencing provisions: Licensees may accept bets from those present in Missouri, and nowhere else. This kind of law—one that overtly blocks the flow of interstate commerce at a State's borders—is, the Supreme Court has said, "[t]he clearest example" of unlawful protectionism. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). By barring transactions that cross state lines, Missouri excludes out-of-State market participants from transactions that would otherwise occur in interstate commerce. The CFTC has recognized as much, explaining that location-based restrictions "fragment a national pool of liquidity" and "concentrate trading activity among a smaller or less diverse set of participants." Impartial Access Interpretation, *supra*, at 5.

126. Missouri's sports-wagering laws therefore violate the Commerce Clause as applied to Polymarket US.

127. 42 U.S.C. § 1983 provides a civil cause of action to any person deprived, under color of law, of rights guaranteed by the United States Constitution or federal law.

128. Defendants, acting under color of state law, have deprived and will deprive Polymarket US of its rights under the Commerce Clause through the threatened enforcement of Missouri's sports-wagering laws.

**PRAYER FOR RELIEF**

An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory, and injunctive relief.

WHEREFORE, Plaintiff Polymarket US respectfully requests that this Court enter the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, that Missouri's sports wagering and gaming laws, including Missouri Constitution Art. III, Section 39(g), are preempted under the CEA and unconstitutional as applied to Polymarket US.

B. Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from taking any steps to enforce the Missouri Constitution Art. III, Section 39(g), or any other state law or regulation to the extent it purports to regulate or prohibit Plaintiff's activities governed exclusively by federal law, discriminates against interstate commerce in violation of the U.S. Constitution's Commerce Clause, or otherwise conflicts with federal law;

C. An award for Plaintiff's attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988 for successful 42 U.S.C. § 1983 claims; and

D. Any other relief within this Court's discretion that it deems just and proper.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Edward L. Dowd, Jr.*
DOWD BENNETT LLP

Edward L. Dowd, Jr. #28785MO
Adam Simon #68396MO
7676 Forsyth Boulevard
St. Louis, MO 63105
Telephone: 314.889.7340
edowd@dowdbennett.com
asimon@dowdbennett.com

GIBSON, DUNN & CRUTCHER LLP

Orin Snyder*
Matt Benjamin*
Rachel Jackson*
Amanda LeSavage*
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

**Pro hac vice forthcoming*
*Attorneys for Plaintiff QCX LLC d/b/a Polymarket US*